IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                No. 06-20051-B

DELAWRENCE WILLIAMS,

    Defendant.
_____

**ORDER DENYING MOTION TO SUPPRESS**
_____

    The Defendant, Delawrence Williams, was charged in a one-count indictment filed February 21, 2006 with being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). The Defendant has moved to suppress all physical evidence, including statements or admissions by Williams as well as any evidence obtained from the search of his residence at 440 Bean Mill Road, Dyersburg, Tennessee. He also asserts that there was no probable cause for the police to search his residence and that the search was obtained without valid consent, prior to the issuance of a warrant on the day of the search, September 28, 2003.

    At the hearing on the motion to suppress, the Government introduced the testimony of several witnesses, including Sergeant Kenny Gibbons. Gibbons is a patrol officer with the Dyer County Sheriff's Department and, on September 28, 2003, received a call regarding an unknown disturbance at the residence on Bean Mill Road. When he came upon the scene, he saw a person later identified as Vivial Taylor walking some three or four houses from the location of the incident. Gibbons stopped Taylor and conversed with her about what had occurred at the residence. She indicated that she and her boyfriend, Williams, had argued over money and they fought in the bedroom whereupon he threw her out of the bedroom and into the kitchen. He apparently proceeded to assault her in the kitchen as a result of which both exited the residence. Other officers, Deputies Waller and Fair, were talking to Williams at the time of the conversation between Taylor and

1

Gibbons.

Taylor informed the officer that she had obtained a knife after the two had scuffled in the kitchen and demanded her keys. Williams refused but she apparently was able to obtain them and left the premises. After she got in her car, Williams allegedly struck the front and rear windows of Taylor's vehicle with a sling blade. Following that, she rammed her car into Williams' vehicle. Based on the information he had obtained, Gibbons arrested Taylor for aggravated domestic assault and placed her in the back of the patrol car. At about that time, she stated that if she had to go to jail the Defendant would be going for a long time as well. She related that there was powder cocaine and marijuana inside the residence. Gibbons recalled that Taylor was advised at that point that the officers would need to take photographs of any evidence relating to the assault, which he averred was standard practice for domestic altercation calls. She made no objection to the request and offered keys to the residence, which were located in her car. Gibbons believed Taylor had authority to permit the search, as the officers knew from prior dealings that the two were domestic partners.

Dyer County Deputies Gibbons and Waller took the keys and opened the front door and encountered two other individuals inside the house, a Mr. Cates and Ms. Belk. They were asked if either had seen the domestic disturbance, whereupon one or both indicated that they had. The officers informed the two that they needed to take photos of where the parties had fought and when they asked to go inside to take these pictures, neither voiced an objection. Gibbons recalled that when the officers asked Taylor for permission to go inside the house, Williams had already been placed under arrest and taken to the police station.

Gibbons related that Cates told him he had been living in the residence about one month and Belk said that she had just been visiting. The officer did not recall asking Cates for permission to search the house, but Cates voiced no objection to the officers' presence. Upon going into the kitchen and bedroom to take the photos, the officers observed a cigar that appeared to have marijuana inside as well as a napkin with white residue which resembled cocaine on a dresser in the bedroom.

The next witness for the Government was Sergeant Lynn Waller, also a Dyer County Sheriff's Deputy. He recalls encountering Williams at the 440 Bean Mill Road location whereupon the Defendant stated that he "did it," that is he hit Taylor and stated that he should go to jail. The Defendant purportedly stated at least twice that if anyone should go to jail, he should. Waller recalled that Williams was very upset, agitated and belligerent. The officer saw that damage had been inflicted upon both cars.

Defendant was placed under arrest and transported to jail by Deputy Fair. Waller then spoke to Taylor who stated that she lived at the residence and that the officers could go in to see what had happened. She told Waller where the keys were whereupon the officers went into the residence and encountered Cates and Belk. He informed the two of the nature of the police presence and that officers had to take photographs of the premises. They replied that that would be fine. The officer confirmed what had been seen by Gibbons when they went into the bedroom. According to Waller, when the drugs were observed on the dresser, the officers backed out of the room and contacted Investigator Terry McCreight.

On cross-examination, Waller stated that Taylor, whom he identified as Williams' girlfriend, said that she lived in the residence off and on and would leave when there were disputes but would later return. He interpreted her explanation to mean that "she lived there, but she would get mad and leave and they would get back together." Waller recalled that Williams had just recently been arrested for drugs but did not know any of the particulars.

The next witness was McCreight, a criminal investigator with the Dyer County Sheriff's Department. He related that he was called by Gibbons on the day of the incident and informed about the statements by Taylor concerning the drugs inside the residence. This officer was familiar with Williams but had not had direct contact with him. He did know that Williams was a convicted felon. The investigator related that cocaine and marijuana were found inside the house as well as firearms. The officer stated that he was aware that a convicted felon in Tennessee was not allowed to possess firearms. He also recalled that Taylor never mentioned anything to the other officers

about firearms or ammunition.

The Defendant called Vivial Taylor as a witness who testified that the police were called to the scene on Bean Mill Road regarding a domestic dispute. She related that she told the police that she had a set of keys in her car but stated that they were the Defendant's. She did admit that she told the officers there were drugs inside the home and that she had stayed there overnight. However, she denied that she actually lived there and did not tell the officers that she resided there. She could not recall if the officers ever asked her for permission to go inside to take photos. She claimed that McCreight asked her for consent to search but told him that she could not because she did not live there. Taylor also stated that she did not have a key to the house but had taken those keys in order to get away from Williams. She did admit to having an argument and a "tussle" in the house and confirmed she told McCreight that there were drugs inside the house but did not see them.

The next witness for the defense was Mervin Cates who claims that he was living at the Bean Mill Road address on September 28, 2003. He initially stated that he had been there approximately one year but then corrected that assertion indicating that he only lived there about two to three months. He recalled the police coming in with a key but none of the officers asked him or Belk if they could look around. However, he never objected to the police seeing where the altercations occurred. Cates claimed that he was a close friend of the Defendant having grown up with him. He never actually paid rent to Williams but worked at his clothing store. He also stated that he told the officers he was not the owner of the premises and did not object to the police looking around.

The Government recalled investigator McCreight who refuted Taylor's assertion that he had asked her permission to search the house. He claims that he never asked her for such permission and she never objected to the search. He indicated that he believed he needed to obtain a warrant because he was uncertain as to whether Taylor could give consent based upon his conversation with her.

In the instant motion, the Defendant seeks suppression of evidence seized during the search

of the 440 Bean Mill Road residence.[1]  Specifically, it is the Defendant's position that officers entered his home without his consent.  The Fourth Amendment to the Constitution of the United States provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. amend. IV.  Therefore, search of a premises without a warrant is presumed to be unreasonable absent the application of a well-defined exception to the warrant requirement.  United States v. McClain, 444 F.3d 556, 561 (6th Cir. 2005), pet. for cert. filed, 75 U.S.L.W. 3065 (No. 06-160) (July 28, 2006).  The Government argues in response to the motion that consent was obtained from Taylor.

Although the Fourth Amendment, therefore, generally prohibits warrantless entry into a person's home, the prohibition does not apply where voluntary consent to search the premises has been given.  United States v. Ivy, 165 F.3d 397, 401 (6th Cir. 1998).  "Valid consent may be given

---

[1] In his motion, the Defendant sought suppression of his statements made at the scene as well as subsequent statements made in formal custody.  The only evidence adduced at the suppression hearing concerning Williams' statements consisted of those made at the scene of his arrest. It was unclear to the Court at the conclusion of the hearing whether the Defendant still intended to pursue suppression of these statements.  Even if his position as to the statements has not been abandoned, they were not taken in violation of the constitution.  In Miranda v. Arizona, 384 U.S. 436, 444, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694 (1966), the Supreme Court stated that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination."  Thus, Miranda warnings are required only when the suspect is subject to custodial interrogation. United States v. Swanson, 341 F.3d 524, 528-30 (6th Cir. 2003), reh'g and suggestion for reh'g en banc denied (Nov. 4, 2003).  Suppression is not necessary if the defendant has not been subjected to "either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297 (1980).  "Interrogation" for purposes of Miranda, encompasses "not only . . . express questioning, but also . . . any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301, 100 S.Ct. at 1689-90.  However, "where a defendant makes a voluntary statement without being questioned or pressured by an interrogator, the statements are admissible despite the absence of Miranda warnings."  United States v. Murphy, 107 F.3d 1199, 1204 (6th Cir. 1997).  In this case, even though Waller admitted Miranda warnings were not issued to Williams at the scene, there is no indication whatsoever that the statements were anything but voluntary and spontaneous.

not only by the defendant but also by a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected." United States v. Morgan, 435 F.3d 660, 663 (6th Cir. 2006) (citing United States v. Matlock, 415 U.S. 164, 171, 94 S.Ct. 988, 39 L.Ed.2d 242 (1974)) (internal quotation marks omitted).  "[E]ven where third-party consent comes from an individual without actual authority over the property searched, there is no Fourth Amendment violation if the police conducted the search in good faith reliance on the third-party's *apparent authority* to authorize the search through her consent." Id. (emphasis in original).

> Apparent authority is judged by an objective standard.  A search consented to by a third party without actual authority over the premises is nonetheless valid if the officers reasonably could conclude from the facts available that the third party had authority to consent to the search.

Id. (quoting United States v. Hunyady, 409 F.3d 297, 303 (6th Cir. 2005)); see also United States v. Hudson, 405 F.3d 425, 441 (6th Cir. 2005) (consent by a third party is valid "if the facts available to the officer at the moment would warrant a man of reasonable caution in the belief that the consenting party had authority over the premises.").  In making its determination, the Court is to consider the totality of the circumstances, and no one fact is determinative. Hudson, 405 F.3d at 442-43.

According to the testimony of the officers, who the Court finds to be credible, Taylor indicated she had keys to the home.  The officers informed her they would need to go into the residence.  She did not object and offered the keys.  It was Gibbons' testimony that the officers believed she had authority to grant consent to search the residence based on her statement that she had spent the previous night there and on their knowledge, obtained from other dealings with the couple, that they were domestic partners.  He specifically remembered observing Taylor at the residence on previous calls.  In addition, the altercation which precipitated the police presence occurred inside the house and her car was parked there.  After entering the house, the officers encountered Cates and Belk in the living room.  Cates, who also lived at the home, offered no objection to the officers' presence.  While it is a very close question, the Court finds that Taylor did consent to a search of the address and that she possessed apparent authority to consent to the search.

Even if she lacked such authority, it is the further opinion of the Court, based upon the totality of the circumstances, that the search was conducted in good faith reliance on her apparent authority to authorize the search. See id. (defendant's girlfriend had apparent authority to consent to search his residence where officers reasonably believed that the two were romantically involved, the couple and their child lived with the defendant's grandmother at the address searched, and the girlfriend had a key); United States v. Gillis, 358 F.3d 386, 390-92 (6th Cir.), cert. denied, 543 U.S. 856, 125 S.Ct. 219, 160 L.Ed.2d 93 (2004) (girlfriend had apparent authority to consent to search even though she maintained a second residence on the side, had no keys to her boyfriend's dwelling; where she provided officers following a domestic violence call with detailed information about the premises including locations where defendant kept drugs, that she resided at the location and that she had been there earlier that day).

      The Defendant suggests, however, that this case is similar to the Supreme Court's recent decision in Georgia v. Randolph, ___ U.S. ___, 126 S.Ct. 1515, 164 L.Ed.2d 208 (2006). In that case, also involving a domestic dispute, both parties complained to police on the scene that the other was a drug user. Randolph, ___ U.S. at ___, 126 S.Ct. at 1519. One of the officers asked the husband, Scott Randolph, for permission to search the house, which he refused unequivocally. Id. The officer then turned to Mrs. Randolph and asked her for consent to search. She readily consented. Id. Scott Randolph moved for suppression of drugs found in the home as fruit of a warrantless search wrongfully authorized by his wife's consent over his refusal. Id. The Court concluded that, under those circumstances, "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." Id. at ___, 126 S.Ct. at 1526. The Court explained that the line drawn in the case before it was a fine one, stating that "

> if a potential defendant with self-interest in objecting is in fact at the door and
> objects, the co-tenant's permission does not suffice for a reasonable search, whereas
> the potential objector, nearby but not invited to take part in the threshold colloquy,

7

loses out." Id. at ___, 126 S.Ct. at 1527.  The Court recognized, however, that

> [s]o long as there is no evidence that the police have removed the potentially objecting tenant from the entrance for the sake of avoiding a possible objection, there is practical value in the simple clarity of complementary rules, one recognizing the co-tenant's permission when there is no fellow occupant on hand, the other according dispositive weight to the fellow occupant's contrary indication when he expresses it.

Id.

While Williams was not physically present when Taylor gave consent to search, there is no evidence to indicate Williams was taken from the scene for the purpose of removing a party who likely would have objected to the search.  Rather, the evidence shows simply that the decision was made to transport him to jail based on his state of agitation.  Thus, there is nothing in Randolph that would alter the Court's conclusion.[2]  Based on the Court's finding that the officers had consent to enter the house, "objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure." United States v. Ellison, 462 F.3d 557, 561 (6th Cir. 2006) (citation and internal quotation marks omitted).  Accordingly, the drugs in plain view on the dresser in the bedroom where the altercation began were properly seized.

The Court also finds that any firearms found in the residence were subject to seizure.  "An affidavit underlying the issuance of a search warrant must provide information sufficient to establish 'a substantial basis for determining the existence of probable cause.'" United States v. Pruitt, 458 F.3d 477, 480 (6th Cir. 2006) (quoting United States v. Leon, 468 U.S. 897, 915, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984)).  "To demonstrate probable cause to justify the issuance of a search warrant, an affidavit must contain facts that indicate a fair probability that evidence of a crime will be located on the premises of the proposed search." United States v. Abboud, 438 F.3d 554, 571 (6th Cir. 2006), cert. denied, ___ S.Ct. ___, 2006 WL 2610918, 75 U.S.L.W. 3106, 75 U.S.L.W. 3204, 75 U.S.L.W. 3205 (U.S. Oct. 16, 2006) (No. 06-348) (citation omitted).  "Probable cause is based on the totality of the circumstances; it is a practical, non-technical conception that deals with the factual

---

[2]With the Court's conclusion that the officers were authorized to enter the dwelling by virtue of Taylor's consent, it need not address the Government's alternative argument that the independent source rule applies.

and practical considerations of everyday life." Id. (citation and internal quotation marks omitted).

In Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978), the Supreme Court articulated procedural safeguards for defendants claiming that an affidavit supporting probable cause for a search warrant contained intentional or reckless falsehoods. See Franks, 438 U.S. at 171-72, 98 S.Ct. at 2684-85. However, if the affidavit was sufficient to establish probable cause even without the falsehood, the warrant is valid. Id.

In the affidavit presented to the issuing judge in support of the search warrant for 440 Bean Mill Road, McCreight averred he had probable cause to believe Williams had in his possession at the residence marijuana and cocaine, and "any and all other evidence directly related to the packaging, storage, concealing, delivery and/or sale of Marijuana and Cocaine, also to include Firearms pistols, shotguns, rifles [and] ammunition." There was no evidence adduced at the hearing to suggest that weapons were located at the Bean Mill Road address. McCreight himself admitted during his testimony that Taylor never mentioned there was a gun in the house. Nor did he state in the affidavit that he had knowledge drug dealers were known to carry weapons or to use them to protect their illegal product. Therefore, it appears to the Court the statement in the affidavit that McCreight possessed probable cause to believe firearms were located in the house was an intentional or reckless falsehood. The Court must then determine whether the affidavit contained information to establish probable cause absent the falsehood. See id. Clearly, the affidavit was sufficient to establish probable cause to search for drugs, based on the observation of drugs in plain view upon the officers' entry into the bedroom, which the Court has herein determined was not unconstitutional. Indeed, the Defendant does not argue that the portion of the affidavit involving drugs was defective.

While the valid portion of the search warrant mentioned only drugs, seizure of the firearms did not violate the Fourth Amendment. "Generally, officers are obligated to secure an additional warrant if they want to seize things not included in a warrant. However, where a warrant justifies an officer's initial intrusion and the officer in the course of the search comes across some other article of incriminating character, the plain view doctrine may supplement the prior justification and

9

permit the warrantless seizure." Shamaeizadeh v. Cunigan, 338 F.3d 535, 554 (6th Cir. 2003), cert. denied, 541 U.S. 1041, 124 S.Ct. 2159, 158 L.Ed.2d 729 (2004) (citing Coolidge v. New Hampshire, 403 U.S. 443, 465, 91 S.Ct. 2022, 29 L.Ed.2d 564 (1971)) (internal quotation marks omitted).  An officer may seize an item in plain view "so long as the agent is lawfully present, the discovery is inadvertent, and the incriminating nature of the item is immediately apparent" United States v. Blair, 214 F.3d 690, 698 (6th Cir.), cert. denied, 531 U.S. 880, 121 S.Ct. 191, 148 L.Ed.2d 132 (2000) (citation and internal quotation marks omitted).  "When officers executing a search warrant seize an item in plain view that is outside the scope of the warrant, the officers must have probable cause to believe that there is a nexus between the viewed item and criminal activity." Id.  Where there is probable cause to associate the item with criminal activity, a plain view seizure is "presumptively reasonable." Shamaeizadeh, 338 F.3d at 554.

In this case, the Court has concluded that the officers were lawfully present in the home executing the search warrant when the firearms were found.  There is no evidence that the discovery was anything but inadvertent.  Finally, the incriminating nature of the firearms was immediately apparent.  Although the incriminating nature of a firearm is not always immediately apparent, it certainly was in this case, as the officers were aware Williams was a felon.

Based on the foregoing, the motion to suppress is DENIED.

IT IS SO ORDERED this 1st day of November, 2006.

                                              s/ J. DANIEL BREEN
                                              UNITED STATES DISTRICT JUDGE